No. 101,785

STATE OF KANSAS, *Appellee*, v. ANDRE BAILEY, *Appellant*.

(255 P.3d 19)

Opinion filed July 15, 2011.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, argued the cause and was on the brief for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Andre Bailey appeals from his convictions of one count of first-degree murder, two counts of aggravated robbery, one count of aggravated burglary, one count of criminal discharge of a firearm at an occupied building, one count of possession of marijuana with intent to sell, and one count of no tax stamp.

Late on August 10, 2007, Sade James picked up her friend Cheryl Starr for a night of drinking and partying. James exchanged text messages with Bailey and agreed to pick up Bailey and his friend DaQuan Dean. The group continued to drink and party, eventually stopping at the apartment of Cindale Terrell. The group continued to drink; Starr, Bailey, and Dean also smoked marijuana.

The conversation turned to guns, and Bailey produced a 9 mm handgun from his backpack. The group took pictures posing with the 9 mm and a shotgun that was located in the apartment. James drove the foursome to Starr's house, where she ran inside after something. The group then returned to the apartment; Bailey and Dean went into the apartment and returned with the shotgun. They stopped at a QuikTrip and picked up something to eat.

Bailey had expressed a desire to go to a house where he knew they could get 18 "bricks" of marijuana. Bailey eventually gave James directions to the targeted house. James stopped at a cul-de-sac, and the three others left the vehicle and crossed a drainage ditch to the adjoining street. Later, Dean called James and directed her to move the car to the next street over.

At the house, Dean kicked in the door. Starr went into the living room, while Dean and Bailey continued to the back bedroom where Ricky Stewart, Meagon Hicks, and her youngest son were sleeping. Hicks' 4-year-old son and 5-year-old daughter were asleep across the hall.

Hicks was awakened by Bailey holding a handgun in her face and demanding the "bricks." Dean was standing in the bedroom doorway with a shotgun. Stewart eventually left the room with Dean to get a "brick" of marijuana. Stewart and Dean passed Starr in the living room and left the house.

Bailey hit Hicks on her forehead with the handgun, telling her to shut up. The older children awoke and entered the bedroom. Bailey shoved the older girl at Hicks and picked up the older boy and threw him on the bed. Bailey demanded Hicks' purse; she denied having a purse. Bailey hit Hicks on the back of her head with the handgun, calling her a "lying bitch." Bailey eventually found the purse and left the room.

Starr had left the house shortly after Dean left. Bailey left the house and met Starr on the sidewalk outside the house. Bailey asked where Dean was. Starr responded that she did not know and ran to the car. Starr met Dean running on the sidewalk; the two of them returned to the vehicle at nearly the same time.

Inside the residence, Stewart returned to the bedroom, attempting to comfort Hicks, and asked for the phone. Hicks told him the phone had been shut off and she did not know where it was. The couple, followed by Hicks' 5-year-old daughter, went into the living room in search of keys to their vehicle. Hicks saw someone opening the front door and ran to push the door closed. Stewart pushed her out of the way and attempted to close the door himself. Moments later, Hicks heard several gunshots and Stewart screamed that he had been shot.

Starr reported hearing gunshots after she and Dean had joined James in the vehicle, but before Bailey returned to the car. James testified that she moved the vehicle again after Starr and Dean returned to the car, where she picked up Bailey. According to James, Bailey stated that he had returned to the house because he thought Dean remained inside and Bailey emptied his clip into the

door. Starr testified that she did not remember any discussion after Bailey returned to the car.

Once inside the car, Bailey divided the money from Hicks' purse, giving each person $86. Because Bailey felt sick, the group stopped at a QuikTrip and picked up water, cigarettes, and "blunt sticks." Bailey vomited at a stop light. The group returned to Terrell's apartment. At the apartment, a large quantity of marijuana, referred to as a "brick," was divided among Bailey, Starr, Dean, and possibly Terrell.

Stewart died as a result of the gunshot wounds sustained from the gunshots fired through the door of Stewart's home.

Because Bailey was 17 years old, charges were originally filed with the juvenile court. The State filed a motion pursuant to K.S.A. 2010 Supp. 38-2347, seeking to have the case transferred to adult court for prosecution. The motion was granted and Bailey was tried as an adult on the following charges: one count of first-degree murder, two counts of aggravated robbery, one count of aggravated burglary, one count of criminal discharge of a firearm at an occupied building, one count of possession of marijuana with intent to sell, and one count of no tax stamp. At trial, the evidence included testimony from James, Starr, and Dean. The jury returned a verdict of guilty on all counts.

### ADULT CERTIFICATION

In 2006, K.S.A. 38-1636 was repealed; thereafter, K.S.A. 2010 Supp. 38-2347 has provided for the certification of juveniles as adults for prosecution. Bailey was certified as an adult on January 10, 2008, for crimes occurring in August 2007. The parties agree that K.S.A. 2010 Supp. 38-2347 controls.

The factors enumerated in K.S.A. 38-1636(e) and K.S.A. 2010 Supp. 38-2347(e) are identical except for the use of "juvenile" in place of the word "respondent." Of potentially more import, K.S.A. 2010 Supp. 38-2347(f) requires that the court find "from a preponderance of the evidence" that the individual should be prosecuted as an adult for the offense, rather than finding "that there is substantial evidence" as required by K.S.A. 38-1636(f). The "preponderance of the evidence" standard is a more rigorous standard

than "substantial evidence." *In re Due Process Hearing of Bailey*, 233 Kan. 714, 722, 664 P.2d 1379 (1983) (quoting *Town of Burlington v. Department of Ed., Etc.*, 655 F.2d 428, 431 [1st Cir. 1981]).

The statutory change applies to the standard used by the trial court, but does not change our standard of review. When a trial court considers a question of fact which must be proved by a preponderance of the evidence, this court's review is limited to determining whether substantial competent evidence supports the trial court's finding. *See, e.g., State v. Loggins*, 40 Kan. App. 2d 585, 588, 194 P.3d 31 (2008) ("Whether the State has met its burden to prove a prior conviction by a preponderance of the evidence is a question of fact, and an appellate court's review is limited to determining whether substantial competent evidence supports the district court's finding."); *State v. Thompson*, 37 Kan. App. 2d 589, 593, 155 P.3d 724 (2007) (reviewing whether the State proved "by a preponderance of the evidence that the consent was voluntarily, intelligently, and knowingly given" under a substantial evidence standard).

"An appellate court reviews the trial court's decision to authorize prosecution of a juvenile as an adult to determine whether there is substantial evidence in the record to support the decision." *State v. Davis*, 37 Kan. App. 2d 650, Syl. ¶ 10, 155 P.3d 1207 (2007) (reviewing adult certification under K.S.A. 38-1636). This court does not review the analysis of the trial court; instead, the standard of review applies to the evidence. *State v. Avalos*, 266 Kan. 517, 521, 974 P.2d 97 (1999).

The journal entry indicates the following which support finding that the adult certification was proper: (1) the State's motion for adult prosecution was pursuant to K.S.A. 2010 Supp. 38-2347; (2) Bailey did not contest the motion for adult prosecution; (3) the trial court accepted Bailey's stipulation to the motion; and (4) the trial court considered each of the statutory factors listed in K.S.A. 2010 Supp. 38-2347. The troubling part of the journal entry is the concluding language: "Therefore, after considering all eight (8) factors pursuant to K.S.A. 38-1636(e), the Court finds that there is substantial evidence that the Respondent should be prosecuted as

an adult for the offense(s) alleged in the amended complaint filed herein."

Bailey argues that the trial court's citation of the old statute invalidates the certification for adult prosecution; however, Bailey was unable to identify any factors in the current statute which were not considered by the trial court. The State points out that Bailey did not contest the adult certification and the trial court did consider the eight statutory factors. The State also asserts that the factors considered by the court, and listed in the journal entry, are sufficient to support a finding under either the "substantial evidence" standard or the "preponderance of the evidence" standard.

In *State v. Smith*, 268 Kan. 222, 246, 993 P.2d 1213 (1999), this court reversed a juvenile's stipulation to adult prosecution because the trial court had not considered both the juvenile's stipulation and evidence of the eight statutory factors. But in *State v. Ellmaker*, 289 Kan. 1132, 1148-50, 221 P.3d 1105 (2009), this court concluded that it had no jurisdiction to consider adult certification when the juvenile consented to the order and the trial court considered the eight statutory factors before waiving juvenile jurisdiction. In this case, the journal entry indicates that the trial court considered both Bailey's stipulation and the eight statutory factors before waiving juvenile jurisdiction. But the trial court apparently reviewed the factors under the wrong standard; therefore, this court will review the adult certification using the facts found by the trial court.

The trial court made the following findings: (1) Bailey was 17 years old at the time of the offenses; (2) the seriousness of the alleged offenses is so great that the protection of the community requires criminal prosecution; (3) the offenses were committed in an aggressive, violent, premeditated, or willful manner; (4) Bailey was charged with first-degree murder and other offenses against persons; (5) Bailey had one prior adjudication as a juvenile offender; (6) Bailey had a history of antisocial behavior or patterns of physical violence; (7) there are no facilities or programs available which are likely to rehabilitate Bailey prior to the expiration of juvenile jurisdiction; and (8) the interests of Bailey or the community would be better served by criminal prosecution. These stip-

ulated facts provide substantial evidence to support the trial court's decision to certify Bailey as an adult for prosecution.

## Jury Instructions

Bailey raises several complaints about the jury instructions, specifically: (1) the felony-murder instruction did not properly instruct the jury on the issue of whether the underlying felonies had been completed before the commission of the murder; (2) the felony-murder instruction should have included a unanimity instruction on the underlying felonies; and (3) the felony-murder instruction should have defined "attempt."

This court's standard of review depends upon whether the challenged instruction was objected to at trial.

"When a party has objected to an instruction at trial, the instruction will be examined on appeal to determine if it properly and fairly states the law as applied to the facts of the case and could not have reasonably misled the jury. In making this determination an appellate court is required to consider the instructions as a whole and not isolate any one instruction." *State v. Appleby*, 289 Kan. 1017, 1059, 221 P.3d 525 (2009).

"An appellate court reviewing a district court's giving or failure to give a particular instruction applies a clearly erroneous standard where a party neither suggested an instruction nor objected to its omission. [Citation omitted.] An instruction is clearly erroneous only if the reviewing court is firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." *State v. Martinez*, 288 Kan. 443, 451-52, 204 P.3d 601 (2009).

### *Underlying Felonies*

First, Bailey complains that the felony-murder instruction did not require the jury to determine whether the underlying felonies had been completed before the commission of the murder. Bailey argued generally against the felony-murder instruction during the instructions conference, but neither made a specific objection on this basis nor proposed jury instructions that would have covered this issue. The State responds that PIK Crim. 3d 56.02 sufficiently requires the jury to find that the murder occurred during the commission of the underlying felonies, such that no additional instruction is necessary.

Whether an underlying felony has been completed prior to the commission of a felony murder is ordinarily a question of fact for

the jury. *State v. Hearron*, 228 Kan. 693, 696, 619 P.2d 1157 (1980). However, this court has concluded that the PIK Crim. 3d 56.02 jury instruction properly instructs the jury and fairly states the law on this issue. *State v. Jackson*, 280 Kan. 541, 550-51, 124 P.3d 460 (2005) (citing *State v. Beach*, 275 Kan. 603, 625, 67 P.3d 121 [2003]). In *Jackson*, this court reviewed PIK Crim. 3d 56.02 under the more liberal standard because Jackson had requested a more specific jury instruction. See also *State v. Ransom*, 288 Kan. 697, 713, 207 P.3d 208 (2009) (noting that this court has "previously approved the causation aspect of PIK Crim. 3d 56.02").

In this case, Bailey did not request a specific jury instruction, nor did he make a specific objection to this instruction; therefore, the court reviews this issue under the stricter, clearly erroneous standard. The PIK jury instruction given in this case requires that the jury find that the murder occurred while the underlying felonies were being committed or attempted. Following the analysis of current case law, the jury's verdict finding Bailey guilty of felony murder indicates that the jury found Bailey killed the victim during one of the underlying felonies alleged.

Further, Bailey argues that the felony-murder instruction should not have included the underlying crimes of aggravated burglary and aggravated robbery because these crimes had been completed prior to the murder. Bailey objected to the instruction on this basis. The trial court ruled that completion of the underlying felony raised a fact question for the jury to decide. Bailey was allowed to argue this theory during closing arguments. Because Bailey objected to this instruction on this basis, the court must consider the instructions as a whole to determine whether the instruction fairly states the law as applied to the facts of the case.

The State argues that the facts support a finding that the murder occurred during the commission of the aggravated burglary, aggravated robbery, and criminal discharge of a firearm. The State contends that there was no break in the events between the aggravated burglary, aggravated robbery, and criminal discharge of a firearm. As the State points out, these events were closely related in time. All three underlying felonies occurred before Bailey re-

turned to the vehicle, where the proceeds of the robbery were divided.

Again, whether the underlying felonies were completed before the murder is ordinarily a fact question for the jury. *Hearron*, 228 Kan. at 696. The evidence shows that Bailey forcibly entered Stewart's and Hicks' home, stole drugs and money from them at gunpoint, and shot and killed Stewart—all before returning to the vehicle in which he arrived. Afterwards, he reunited with Dean, Starr, and James at the vehicle, where the stolen money was divided among the group. The evidence in this case would not support a finding that, as a matter of law, the aggravated burglary and aggravated robbery were completed before the murder. The decision on this issue was properly allocated by the trial court. The jury was properly informed, by the instructions and the arguments of counsel, that felony murder is committed only when the murder occurs during the commission of the underlying felonies. The jury, by its verdict, found that the murder occurred during the commission of one or more of the underlying felonies.

*Unanimity Instruction*

Bailey was charged with felony murder based on the following underlying felonies: aggravated burglary, aggravated robbery, or criminal discharge of a firearm. Bailey acknowledges that a unanimity instruction was not requested and no objection was made at trial; therefore, the court will use a clearly erroneous standard of review.

Bailey argues that the underlying felonies were multiple acts because the criminal discharge of a firearm was separated in time from the aggravated burglary and aggravated robbery. Bailey further claims that the criminal discharge of a firearm was motivated by a fresh impulse, that of finding and helping a codefendant, who Bailey believed had not left the house during the burglary and robbery. Such a claim stretches the imagination; even under Bailey's version of the facts, his return to the house was a result of the uncompleted burglary and robbery.

The State maintains that this was an alternative means case, citing *State v. Hooker*, 271 Kan. 52, 57, 21 P.3d 964 (2001). In

*Hooker*, the defendant was charged with felony murder based on either aggravated burglary or robbery. The court concluded that these underlying crimes were alternative means because the same facts justified both underlying crimes. *Hooker*, 271 Kan. at 59.

This court has ruled that different underlying felonies supporting a charge of felony murder are alternative means rather than multiple acts. *State v. Becker*, 290 Kan. 842, 235 P.3d 424 (2010) (holding that three kidnapping charges as the alternate underlying felonies for felony murder were alternative means); *Hooker*, 271 Kan. at 52, 59. When a single offense is alleged that may be committed in more than one way, the court is presented with an alternative means case. *Becker*, 290 Kan. at 855. When several acts are alleged, any of which could constitute the crime charged, the court is presented with a multiple acts case. *Becker*, 290 Kan. at 855.

In this case, a single offense was committed—the unlawful shooting of Stewart—which could have been committed during the aggravated burglary, aggravated robbery, criminal discharge of a firearm, or some combination thereof. Therefore, the charges of aggravated burglary, aggravated robbery, and criminal discharge of a firearm were alternative means of committing felony murder.

"In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means. In reviewing an alternative means case, a court must determine whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt. In multiple acts cases, on the other hand, several acts are alleged and any one of them could constitute the crime charged. In these cases, the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, courts require that either the State elect the particular criminal act upon which it will rely for conviction or that the district court instruct the jury that all jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt." *State v. Dixon*, 289 Kan. 46, Syl. ¶ 7, 209 P.3d 675 (2009).

As alternate means, the felony-murder instruction did not require a unanimity instruction. Bailey does not challenge the sufficiency of the evidence supporting each of the alternative means. The jury convicted Bailey of each of the underlying felonies, which

would tend to support a holding that sufficient evidence supported each of the alternative means. As a result, there was no error in the failure to give a unanimity instruction.

*Definition of Attempt*

As requested in Bailey's proposed jury instructions, the second element of the felony-murder instruction given to the jury stated: "That such killing was done while in the commission of or attempting to commit aggravated robbery, aggravated burglary or criminal discharge of a firearm at an occupied building." Neither Bailey's proposed instructions nor the instructions given to the jury included a definition of "attempt." Bailey now contends that the felony-murder instruction was clearly erroneous due to this omission. Bailey did not object on these grounds. When defendant's requested instruction is given to the jury, the defendant cannot complain the requested instruction was error on appeal. *State v. Patchett*, 229 Kan. 163, Syl. ¶ 3, 621 P.2d 1011 (1981).

Further, the parties agree that there was no evidence at trial that the underlying crimes were attempted rather than completed and our review of the record leads to the same conclusion. In fact, the jury convicted Bailey of all three underlying felonies. Under these facts, the language "or attempting to commit" in the complaint and jury instruction was merely surplusage because there was no evidence that the underlying crimes were attempted rather than completed crimes. See *State v. McCoy*, 34 Kan. App. 2d 185, 191, 116 P.3d 48 (2005) (finding no reversible error when the trial court erroneously included an element of obstruction of legal process in an instruction for obstruction of legal duty when the instruction as a whole fairly instructed the jury). Although a proper jury instruction including this language would also define attempt, the inclusion of superfluous language in this instruction was harmless. Removing the extraneous language "or attempting to commit" in the jury instruction on felony murder would not have changed the outcome in this case. No rational jury could have found attempt under these facts.

## WITNESSES' FIFTH AMENDMENT PRIVILEGES

Bailey argues that it was improper for the trial court to inform

Starr that she did not have a Fifth Amendment privilege and to encourage Starr to testify. Bailey further argues that it was improper for the trial court to inform Dean that he did not have a Fifth Amendment privilege and to put Dean on the stand just so that Dean could refuse to testify. Bailey did not object when the testimony at issue was introduced to the jury. In order to preserve an issue for appeal, a party must raise a timely and specific objection at trial. *State v. Horton*, 283 Kan. 44, 63, 151 P.3d 9 (2007).

Further, the State contends that Bailey is without standing to assert the Fifth Amendment privileges of Starr and Dean. "The right against self-incrimination is personal to the witness, and the appellant in a criminal action has no standing to assert the witness's privilege." *State v. Smallwood*, 223 Kan. 320, Syl. ¶ 5, 574 P.2d 1361 (1978). In *State v. Anderson*, 240 Kan. 695, 732 P.2d 732 (1987), however, this court reviewed a defendant's objection to testimony of a witness in alleged violation of the witness' Fifth Amendment privilege without any discussion of the defendant's standing on this issue. The court found that although the trial court erred in finding the witness had waived his Fifth Amendment privilege, the limited statements of the witness did not prejudice the defendant. *Anderson*, 240 Kan. at 700-01.

Finally, the Fifth Amendment privilege is not without limits. "The privilege against self-incrimination ends after sentence is imposed where a plea of guilty has been regularly accepted by the court, and no motion is made to withdraw it." *State v. Longobardi*, 243 Kan. 404, Syl. ¶ 1, 756 P.2d 1098 (1988).

*Starr's Testimony*

At the time of Bailey's trial, Starr was serving a 12-year sentence following her guilty plea to second-degree murder (reckless), two counts of aggravated robbery, and one count of aggravated burglary for her part in these events. The State issued a subpoena to compel her presence and testimony in the State's case in chief. Starr was transported from the Topeka Correctional Facility to the Sedgwick County Detention Facility, where the prosecutor met with her to discuss the case. Starr said that she would not testify. The court conducted a hearing with counsel for the State, Bailey, Bailey's

counsel, Starr, and Steve Osburn, the attorney who had represented Starr during her criminal case. The court told Starr that the State had a right to call her as a witness and that Starr had no Fifth Amendment privilege because she had entered a guilty plea and had been sentenced on the case. Neither Starr nor her attorney objected to the court's conclusion. Starr testified without objection.

Because Starr had entered a guilty plea to second-degree murder, two counts of aggravated robbery, and one count of aggravated burglary; had been sentenced on those charges; and had not filed a motion to withdraw her guilty plea, Starr had no Fifth Amendment privilege with regard to testimony related to those charges. See *Longobardi*, 243 Kan. 404, Syl. ¶ 1. Bailey points out that some of Starr's testimony could expose her to criminal liability for crimes not included in her guilty plea. Starr admitted to possessing and using marijuana. Starr also admitted that she had not been truthful with the police at the time of her arrest. Bailey simply argued that all of Starr's testimony was prejudicial to his case, without explaining how this potentially protected testimony specifically was prejudicial.

In fact, the arguably protected testimony tends to discredit Starr by exposing her as a drug user who was using drugs the night of the incident and was untruthful with police. It is the testimony that is clearly outside Starr's Fifth Amendment privilege which related most directly to Bailey's case and was the most prejudicial. Even if it was error to compel Starr to testify about certain matters that were outside of her guilty plea, that issue was not raised before the trial court and not properly preserved for appeal.

### Dean's Testimony

At the time of Bailey's trial, Dean had entered a guilty plea, been sentenced, and filed a notice of appeal. Outside the presence of the jury, the court held a hearing at which Dean, through counsel, advised the court that he wished to assert his Fifth Amendment privilege and, failing that, did not wish to testify. The court found that Dean had no Fifth Amendment privilege to assert. Dean's counsel did not object to this determination. Dean indicated he was not willing to testify despite the court's decision, and the court

advised Dean to speak with his counsel about the matter. Dean was called to testify without objection. Dean identified Bailey, admitted they were first cousins and good friends, and refused to testify further. Dean did not actually assert a Fifth Amendment privilege in front of the jury; instead he repeatedly stated, "I'm not testifying." After dismissing the jury, the trial court found Dean in contempt for his refusal to testify.

Bailey argues that it was error to allow the State to put Dean on the stand knowing that he would refuse to testify. Bailey cites cases in which the witness had a valid Fifth Amendment privilege and was put on the stand for the sole purpose of asserting that privilege before the jury. *State v. Crumm*, 232 Kan. 254, 256-57, 654 P.2d 417 (1982) (finding no error in a trial court's refusal to let the defendant ask questions to which the witness would assert a valid Fifth Amendment privilege); *State v. Simpson*, 29 Kan. App. 2d 862, 872-73, 32 P.3d 1226 (2001) (finding error when a witness' attorney invoked the witness' Fifth Amendment privilege in front of the jury). The State contends that Dean did not have a valid Fifth Amendment privilege. Further, the State argues that Dean was not called for the sole purpose of asserting his Fifth Amendment privilege before the jury; rather, Dean was called in hopes that he had decided to testify.

Bailey cites *Anderson*, 240 Kan. at 700-01, for the proposition that a witness retains his or her Fifth Amendment privilege through the course of the appeal. The witness in *Anderson*, however, did not have a pending appeal. That individual had entered a guilty plea but had filed a motion to withdraw the plea, which was denied; he had not yet been sentenced, nor had the appeal time run on the denial of his motion to withdraw his plea. Under those unique circumstances, the court in *Anderson* determined that the witness had a valid Fifth Amendment privilege. *Anderson*, 240 Kan. at 701. In *Longobardi*, this court specifically limited the *Anderson* ruling, stating: "We hold that once a plea of guilty has been regularly accepted by the court, and no motion is made to withdraw it, the privilege against self-incrimination ends after sentence is imposed. Syllabus paragraph 2 of *Anderson* is hereby limited to this ruling." *Longobardi*, 243 Kan. at 409.

Because Dean had entered a guilty plea and had been sentenced, the trial court was correct in finding that Dean had no Fifth Amendment privilege protecting the events in this case. See *Longobardi*, 243 Kan. 404, Syl. ¶ 1. As Dean had no valid Fifth Amendment privilege, his refusal to testify before the jury is different than refusal by a witness called for the sole purpose of asserting a valid Fifth Amendment privilege to cause jury speculation.

Bailey argues that Dean's limited statements were inherently prejudicial and that "the prejudice was compounded by the fact that before refusing to testify, [Dean] told the jury that he and [Bailey] were cousins and that they have been good friends and buddies for a long time." At trial, Bailey's theory was that (1) the events were separated in time because Bailey had returned to the house to "rescue" Dean, requiring that felony murder must have occurred during the unlawful discharge of a firearm; and (2) Dean, not Bailey, had been the actual shooter, *i.e.*, Dean committed the unlawful discharge of a firearm. Dean's testimony and subsequent refusal to testify further were not prejudicial to this theory; in fact, Dean's testimony arguably bolstered Bailey's position. In any event, any inference the jury made regarding Dean's refusal to testify was inconsequential.

Affirmed.

BUSER, J., assigned.